I think I may I may take 12 you want to say I would like to take 10 minutes for my initial argument and then I'd like to reserve two minutes for rebuttal that leaves your co-counsel with a yes okay have at it may please the court Anthony Colombo on behalf of the appellant William Jenkins in this case Mr. Jenkins Fifth Amendment right to remain silent was violated where he was told by agent special agent Andrew Chase prior to giving any Miranda warnings if you agree to make a statement and cooperate and cooperate and tell me what happened I will tell the prosecutor that you were cooperative and you're likely to receive less time but alternatively if you refuse to cooperate I will tell the prosecutor that you were uncooperative and you're likely to be prosecuted to the full extent of the law that in and of itself is coercive the Fifth Amendment requires that the defendant has the right to remain silent and should be suffered not no penalty for his silence in this case I'm not trying to suggest that I or any member of the panel is taking sides on this but my understanding is the district court concluded that your client was not credible is that right that's that's not correct and that's the government cited that as well I think with the district court referred to in regards to my clients credibility specifically when the district court was addressing the circumstances surrounding the Fourth Amendment and if you look on excerpt page 138 line 12 the beginning on line 12 with the district court is referring to is my client's versions of events versus agent Morgan's version versions of events who was the secondary officer who conduct this conducted the stop what you're saying is the district court cabined its its determination of a lack of credibility to the Fourth Amendment issues yes and that's correct your honor did it say that yes your honor if referring to page 138 of the excerpt of record if I find it that agent Morgan was credible and that you were not in your accounts I credit agent Morgan's account that you were moving quickly and I think you were trying to get out of the lot quickly I specifically address reject your testimony that there was a five minute interim where you and your wife discussed what went on in the secondary area the credibility determination by the court was only cabin to that regards in regards to the Fourth Amendment circumstance not in regards to the Fifth Amendment circumstance and in fact the district court accepted as true what agent Chase had had told my client concerning cooperation versus non-cooperation and that is on excerpt of record 142 if I may quote I accept it as true that agent Chase was going to tell the prosecutor one way or the other these folks were cooperative or uncooperative the problem is the effect on the hearer of this type of thing the district court not only went on to accept that cooperation versus non-cooperation telling my client that prior to advising any Miranda that as true it also specifically stated during its determination in the issue that it was a bad practice to do this it was troubled by what what agent Chase told my client and in fact the district court specifically admonished Mr. or agent Chase not to do this that it's a bad practice just a word to the wise and I'm referring to excerpt of record 144 I wouldn't do that in the future I just think it is troublesome when the incentive to talk is discussed at the beginning the district court specifically credited what agent Chase and what my client claimed when he testified he was told the government also conceded that in that in their argument as well so there is no question in this case that agent Chase told my client before he was advised of his Miranda rights that he would be took he if he cooperated and made a statement the prosecutor would be told and he'd be likely to get less time but in the alternative if he wasn't cooperative then the prosecutor would be told and he'd be prosecuted to the full extent of the law now Supreme Court has said that law enforcement can lie to obtain a statement right? That's true. And this was more true than a lie wasn't it? Well it was but the the problem here and I think this court has already determined in United States v. Tingle that in telling a defendant that the prosecutor would be told of non-cooperation that they refuse to make a statement is punishing them it's chilling their right to refuse to make a statement it's chilling their right to exercise their right to remain silent and that's where the problem comes with now it may have been true that the prosecutor would learn as to whether agent Chase was going to whether Mr. Jenkins made a statement or not but telling the defendant that prior to having advising him of his Miranda rights is basically telling him if you don't cooperate you're going to be punished more severely. Let's suppose this agent had turned to Mr. Jenkins and said we're required to be familiar with the sentencing guidelines in criminal cases in Federal court and I think your case is going to Federal court I think you are going to be charged whether you talk with me or not but I just want you to know that that your sentence and the length of it may be determined by how soon you accept responsibility and how candid you are with me now with that understanding here's your rights do you want to talk would there be a problem with that? I think there would be your honor because even though what I just described is absolutely true it's that I think that as the district court indicated it's a dangerous gambit to enter into this discussion prior to the admission of Miranda that should be something that should come on at the end the defendant has the right to remain silent and something with what your honor just suggested that hypothetical  where it is not of his own free will but it is now he's being advised of the operation of law and the operation of the guidelines that is not something I think that the agent should do at the beginning he should advise the defendant of his right it should be a free choice to whether to waive that right or not and it should not be induced by any threats even if they are true in that regard so I think that with that that  would not be something that's appropriate to do before advising Miranda what I'd specifically like to refer to is what is in United States v. Tingle and it's footnote five although it is permissible for an interrogating officer to represent under some circumstances that the fact the defendant cooperates will be communicated to the proper authorities the same cannot be said of representation that a defendant's failure to cooperate would be communicated to the prosecutor refusal to cooperate is every defendant's right under the Fifth Amendment because there is no legitimate purpose for the statement that failure to cooperate will be reported and because it's only apparent objective is to coerce this court disapproved of making those type of representations and in this case that's only one circumstance that happened under the Fifth Amendment and under the totality of the circumstances you have additional threats that were made in this regard you have the promise of leniency agent Chase admitted that when he talked to Mr. Jenkins he said you're likely to receive less time if you cooperate that's a specific tangible benefit that he was promised to waive his rights which is inappropriate and is well established law in that regard in addition you have the threat and candidly this was something that agent Chase denied although later on he said that he couldn't recall the specific discussion concerning Mr. Jenkins wife Mr. Jenkins when he testified claimed that he was told by agent Chase if you do not cooperate and make a statement to me and tell me what happened your wife will be arrested his wife was a passenger in the car at that time so candidly agent Chase denied that and then stated that he couldn't specifically recall but the district court made no adverse finding in regards to that statement but even disregarding that the first circumstance is coercive and as a result Mr. Jenkins statement should have been suppressed by the district court and the district court did which I'd like to address briefly is the district court said under these circumstances it wasn't coercive because Mr. Jenkins was looking for advice from the agent prior to waiving his Miranda rights he asked the agent basically what should I do and the agent the district court found didn't say the cooperation versus non-cooperation in his stern voice but that's not the analysis if Mr. Jenkins was asking for advice what should I do what should I not do the agent should not have told him or made him any promises in order to get him to waive his rights or any threats whether they be implicit or explicit and in this case that what that is what happened if your honors have no other questions in regards to the Fifth Amendment I'd just like to briefly turn to the Fourth Amendment argument in this case in this case we believe that after Mr. and Mrs. Jenkins were given permission to leave written permission to leave after they had been detained for 45 minutes their cars thoroughly searched and their identities verified they were given written permission to leave and after that were stopped for a second time and they're and subject to search we I would concede that the the at the border there is the government has a greater protection and there is no reasonable suspicion required for the first stop. That's clear I would concede that however for the second stop it was unnecessary delay and excessive and in order to stop them for a second time reasonable suspicion was required and in this case there was not there was no reasonable suspicion as the court recently held in U.S. v. Mendez you cannot just determine that reasonable suspicion is established because somebody had been arrested in this case agent Morgan believed that he recognized Miss Jenkins from a previous incident where she had been detained at the port of entry that in and of itself as U.S. v. Mendez instructs which was issued on October 30th by this court is not enough because it categorizes a great group of people. The other circumstance surrounding reasonable suspicion was the fact that Miss Jenkins was moving quickly to the car but after being detained for 45 minutes to an hour for so reasonable suspicion should have been required it wasn't in this case the district court determined it wasn't and we believe that it should have been required because they had already been detained searched the first time and allowed to leave given permission to leave and reasonable suspicion in this case was not required. With that I would save any my last 20 seconds for rebuttal. Okay. Mr. Molina. Good morning. May it please the court. My name is Martin Molina. I was appointed by this court to represent Sharon Jenkins in this matter and I've also been appointed to represent her on appeal. There are a couple issues that I'd like to focus my attention on and number one is the sufficiency of the evidence in this case. Both in this case Mrs. Jenkins was charged on count one with importation of marijuana aiding and abetting and on count two with possession with intent to distribute marijuana. In this case she was the passenger of the van that was driven by William Jenkins. The van was registered on William Jenkins' name and after they made their entry into the port of entry and after the subsequent seizure of the marijuana Mrs. Jenkins denied knowledge of the presence of the marijuana. She did indicate that her belief was that the van contained an undocumented alien that was concealed on the floorboard of the van in the rear section of the van behind the rear seat. That was the testimony of the agent regarding her post arrest statements. So the panel that they're talking about is actually on the floor? Yes, Your Honor. That was the area that the agent had indicated that she had informed him during the post arrest. And that's where the drugs were found? No, Your Honor. The drugs were found on the side panels of the van and also they were found behind the dashboard of the van. Was there space below this panel where a body could be, right? No, the agents did not find a secret compartment in the floorboard. Didn't she say at one point that she thought they were transporting illegal aliens? Yes, no. She did say that her belief was that they were transporting one undocumented alien. Isn't that an express admission of dominion and control over the vehicle? Well, in this case... If you believe that statement, the statement is I got in this vehicle on the Mexican side of the border. I got in a vehicle in which I knew there was a body that I was going to illegally transport across the border. And to my horror, I found out it was not a body but drugs. Isn't that an admission of dominion and control over the vehicle? It would be what she related to the agent was that her belief that there was a body concealed on the floorboard of the van. The marijuana was concealed on the side panels of the van. Now as to the question of dominion and control, it would be her dominion... The question would be dominion and control over the contraband. And in this case, at most her dominion and control was over the area that she believed the alien was to be concealed. Let me ask you. The van was actually owned by somebody who worked with her or had some relationship to her, wasn't it? Well, the testimony that was adduced at trial revealed that Mr. Jenkins initially told the agent that the van was his. And then when he was interrogated by the case agent, he said, well, it's registered on my name, but the van was not mine. It was a man named Pedro who works with Maria, the alien smuggler, made the paperwork and was in charge of the transfer of the van to my name. But there was no known involvement of Mrs. Jenkins in the transfer of the papering of the van. And the reason why I am bringing this up is because I think this ties in with the case of the United States versus Ramirez and the United States versus Sanchez Mata, in particular in Ramirez. Ramirez is the case where Ramirez drove a pickup truck that was rented on his name through the port of entry. Smith was the passenger. And in that case, the agent found 44 pounds of marijuana concealed in the spare tire. And in that case, the passenger was convicted of the charges. And this court reversed that conviction. But one of the things that the court noticed was that, look, the pickup truck rental contract was on a listed Ramirez as one of the authorized drivers. But Smith had no involvement with that in that rental contract. Likewise, in this case, there was no evidence that Mrs. Jenkins was involved in the rental contract on Mr. Jenkins' name. Suppose she had been told that they were transporting, they were to transport across the border counterfeit money, and it turned out to be drugs. Would you take the same position? Well, it depends on where the, well, in terms of what? In terms of dominion and control, Your Honor. Both. Well, I would take the same position. I would take the same position. Well, she was told it was cocaine, and it turned out to be marijuana. No. In that case, I would not take the same position. Because under the court's instructions, the government does not need to show that the defendant knew the actual nature of the specific nature of the controlled substance. It only suffices that the defendant is aware that he was bringing a prohibited drug. Suppose she was told it was drugs, and it turned out to be a bomb. Well, then, in that case, we would have, I am not familiar with the statute regarding the bringing in of an explosive device. And I would have to inform myself of those elements before answering that question. My questions have eaten into, you can use some more time if you want, but we're eating into your co-counsel's I have a minute and 35 seconds left. The total. Yes, Your Honor. Well, I will submit also on my written arguments regarding the denial of the role reduction. In this case, the district court said, look, they were transported, they were convicted of transporting marijuana. There's nothing minor about it. And the cases by this Court have required the district courts to look far beyond the offense of conviction. And I will then let the remainder for my co-counsel, Your Honor. Thank you. Thank you for your argument. We'll hear from the United States at this time. Mr. Hedley. Thank you, Your Honors. Good morning. Neville Hedley for the United States. May it please the Court. Turning to Mr. Jenkins' initial arguments with respect to the Fifth Amendment, I think it's important to recognize that this is a totality of the circumstances or standard that the district court employs when making a determination about whether someone has voluntarily waived their Miranda rights. And in this case, I think it's important to note that I don't think it's appropriate to compartmentalize the district court's determination with respect to credibility. District court did not find Mr. Jenkins credible with respect to his testimony. Now ---- He assumed for the purpose of his ruling that what Mr. Jenkins said was said to him was correct. Is that correct? I don't think that that's entirely correct, Your Honor. I think if you look at pages 142 and 143 of the excerpts of the record with respect to Mr. Jenkins, the district court says it's not that Mr. Jenkins' testimony with respect to what transpired in the interview room is not entirely consistent, not entirely consistent from what he testified, and not entirely consistent from what he put in his declaration. I think the evidence established at the hearing indicates that, one, Agent Chase did not recall saying anything about Mrs. Jenkins. I think in terms of the totality of the circumstances review, the judge appropriately made the determination that, look, Agent Chase went in there, he sees Mr. Jenkins, who, as the district court noted, was a very outgoing, extroverted person, very talkative. This is not just someone sitting there and Agent Chase haranguing him before reading the Miranda rights. This is an extroverted person who is engaging Agent Chase in a conversation as a prelude to the Miranda warnings. Now, I think Judge Burns' admonition to Agent Chase was appropriate, but I don't think that that undermines the district court's determination that in the totality of the circumstances, the things that were said, the exchange between Agent Chase and the defendant, Mr. Jenkins, was not sufficient to overcome his will in that he felt so coerced that he could not exercise his right to decline not to speak to Agent Chase. And I think Judge Burns' notation in the record, or recognition in the record, that here is Mr. Jenkins looking for answers, looking for advice. He is engaging Agent Chase in a conversation. He is the one who brought up the subject of his wife. It was not Agent Chase saying, I see that your wife is here. I see that she's diabetic. No, it was the defendant himself saying, what's going to happen to my wife? And as Agent Chase testified, he has absolutely no recollection specifically what he said about his wife. So I think the court was guided by the more recent case of United States v. Okafor, and I think those facts are very, very similar to the facts that we have in this case. We have a defendant stopped at a port of entry for smuggling, just as in this case, and the agent approaching this defendant and saying, here's what's going to happen. I'm going to write, you know, you can cooperate, you cannot cooperate. I'm going to tell the prosecutor. In United States v. Okafor, this Court found that that was not sufficient, or those things, those factors in the totality of the circumstances, test, were not the type of thing that overcome the defendant's will and coerce someone into waiving their rights. And he would arrest her unless there was an explanation that she didn't know about  I mean, here she is in the vehicle. And there are circumstances, Your Honor, where a passenger doesn't get arrested. And I think a lot of times it depends on what is said. There are circumstances where a driver will exonerate a passenger. But that was not the exchange here. This was not something where Agent Chase said, look, if you admit to this, we're going to cut your wife. We're not going to prosecute her. There's absolutely nothing in the record to indicate that. If that was the case, and as a prelude to Miranda, if that was the case, then the defendant, I think, would have a far more colorable argument that his will was overcome because he was looking out for his wife. I mean, in this situation, he's the one who raised the subject of his wife and what was going to happen to his wife. And Agent Chase, if he said anything, was, I'm going to interview her as well. I'm going to write down what she has to say, if she has anything to say. And I think the testimony was unclear, but Mr. Jenkins' testimony was that Agent Chase told him that I'm going to talk to your wife as well, and if your wife cooperates, I'm going to tell that to the prosecutor, and if your wife doesn't cooperate, I'm going to tell the prosecutor. So I think those are the statements that were agreed upon in terms of what was said to Mr. Jenkins. If you cooperate, I'm going to tell the prosecutor. If you don't cooperate, I'm going to tell the prosecutor. And those statements are almost identical to the statements that were made in Okafor in which this Court found were not enough to overcome a defendant's will and found that there was a valid waiver of Miranda. Now, with respect to the Fourth Amendment issue, I think the Flores-Montano case from the Supreme Court is controlling here. We are talking about a border search. And I don't want to call it an unlimited power at the border by the government to do searches, but Flores-Montano makes very clear that the United States has extremely broad powers to conduct border searches, and that reasonableness with respect to what a border search, what's a reasonable border search is fairly broad. And in the Flores-Montano case, we're talking about a car that came in, gas tank was dropped, and narcotics were found in the gas tank. And that took, according to the Supreme Court, between one and two hours. And according to the Supreme Court, that's not unreasonable. So this notion that somehow that the defendant had received an exit code and had not yet left the port of entry, but were spotted by a very aware, conscientious inspector who wanted to make further inquiry, I think that's the type of thing that Flores-Montano did not want to chill. We're talking about a border search here, and that the government should have had this type of broad power to conduct these searches at the border. And this is not a gauntlet that's been set up to get through the port of entry. I think the situation would be far more different if there were repeated searches after repeated searches after repeated searches. You go from step to step to step, and it takes multiple steps to exit the port of entry. Generally speaking, at the port of entry, there's primary, sometimes you get set to secondary, and then you leave. And in this situation, they were still in the secondary area. They were spotted by a conscientious inspector who recognized Ms. Jenkins from prior incidents at another port of entry for alien smuggling that aroused his suspicion, and he chased that car down. And once he got to that car, noticed things, noticed some discrepancies with respect to that vehicle, and conducted an additional search. There's nothing unreasonable about that. Now, and I think with respect to that, that's the type of thing that inflores Montano that the Court made very clear that should happen at a port of entry, and that there was nothing unreasonable about that. I want to talk a little bit about the evidence concerning Mrs. Jenkins. Now, Mrs. Jenkins, with respect to that issue, Your Honor, I think it's important to emphasize that the standard of review here is that could a reasonable jury, a reasonable juror, based on this evidence, find that this defendant, Mrs. Jenkins, had some dominion and control over these drugs. And looking at the record, looking at the record most favorably from the government's perspective, we have the evidence that was adduced at trial were the statements, the post-arrest statements of both Mrs. Jenkins and Mr. Jenkins. They told very, very similar stories to Agent Chase, that they both thought that they were smuggling aliens, that they had smuggled aliens before, and that they had made these arrangements, and that they both had suspicions about certain things in the vehicle, the radio, the antenna, things of that nature, that aroused their suspicion that there might be drugs. The jury is hearing all this. The jury clearly did not believe what they told Agent Chase and was their defense, that they were smuggling an alien. And from that, from that, the jury could infer, look, this was a joint venture. This was a joint venture not between two strangers, but between a husband and a wife, who both told similar stories to Agent Chase at the port of entry, who both maintained their innocence based on the fact that they said that they thought they were smuggling an alien rather than drugs. And the jury discounted that. The jury discounted the notion that they were smuggling an alien rather than drugs, but clearly credited the part of their story that they had engaged in a joint venture, a joint venture to smuggle an alien. And from that, a reasonable juror could infer that they were both in this together. And I think that's sufficient evidence. Now, the cases that Mrs. Jenkins cites in her brief and that Mr. Molina cited here today, I think are we're talking about strangers or people who are mere acquaintances. The Savage case and I believe the Hall case both involved, that are cited in the government's brief, both involved a husband and wife. And from that and from the evidence adduced at trial, the jury could infer, the court said the jury could infer that because of this special relationship, spouses, that they could, the jury, there's enough evidence there that the jury could convict and find that it was a joint venture, that the wife had as much dominion and control or was involved in it as the husband was. And with that, I would submit. Roberts. Thank you for your argument. Thank you, Your Honor. We have a little time left for rebuttal. There was no adverse credibility finding as to anything that Mr. Jenkins said in regards to his Fifth Amendment, what happened concerning his Fifth Amendment right and his waiver of rights. The most the Court said was on excerpt of record in regards to the additional flesh that the Court referred to that wasn't in Mr. Jenkins' declaration concerning the weight of the marijuana and he would be prosecuted for less weight was maybe that was said, maybe it wasn't. That is the, as far as the district court went. But there, if you, on excerpt of record 142, the district court accepted as true that Agent Chase told Mr. Jenkins about his cooperation versus non-cooperation. In regards to the government's reliance upon Okafor, in Okafor what happened was the defendant was told that the, that if he cooperated and made a statement, the prosecutor would be told and he would likely receive less time. But in this case, Agent Chase went one step further. And this Court has said in Tingle that's one step too far. And he advised him of the adverse, that if you do not make a statement, the government will be told of that and you'll be prosecuted to the fullest extent of the law. That is what Tingle advises is coercive, and that didn't happen in Okafor or any of the cases that the government cited. Roberts. Thank everyone for their argument. It's well-argued the case to this target will be submitted for decision. And we'll proceed to the last case on the calendar this morning, which is the United Arab Emirates.
judges: Kennedy , Hall, Hawkins